Filed 3/30/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.Y., a Person Coming Under the Juvenile Court Law. | B313020 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Appellant;<br><br>    v.<br><br>JEROME Y.,<br><br>    Defendant and Respondent;<br><br>JORDAN K. et al.,<br><br>    Interveners and Appellants;<br><br>V.Y. et al.,<br><br>    Interveners and Respondents. | Los Angeles County<br>Super. Ct. No. 19CCJP04784A<br><br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>**[No change in judgment]** |

THE COURT:

The opinion herein, filed on March 18, 2022, is modified as follows:

On page 2, in the counsel listing, delete "Leslie A. Barry, under appointment by the Court of Appeal, for Respondents V.Y. and M.Y." and replace with: Leslie A. Barry for Respondents V.Y. and M.Y.

There is no change in the judgment.

The petition for rehearing is denied.

_____

GRIMES, Acting P. J.          STRATTON, J.          WILEY, J.

Filed 3/18/22 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.Y., a Person Coming Under the Juvenile Court Law. | B313020 |
| | Los Angeles County Super. Ct. No. 19CCJP04784A |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Appellant;<br><br>JORDAN K. et al.,<br><br>     Appellants,<br><br>     v.<br><br>JEROME Y.,<br><br>     Defendant and Respondent;<br><br>V.Y. et al.,<br><br>     Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge. Reversed.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Appellant.

Pamela Rae Tripp for Appellants.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Respondent.

Leslie A. Barry, under appointment by the Court of Appeal, for Respondents.

Valerie N. Lankford, under appointment by the Court of Appeal, for Minor.

_____

## SUMMARY

When J.Y. was only two months old, he was removed from his parents' custody and placed with foster parents April and Jordan K. (now his de facto parents), who feel he is already their son and want to adopt him. The court terminated reunification services for J.Y.'s birth parents in November 2020. They had received reunification services for more than a year, during which time the Los Angeles County Department of Children and Family Services (Department) identified and assessed (or sought to assess) several relatives for possible placement, including maternal grandmother, paternal grandmother, paternal grandfather, and at least four others. The few relatives who had expressed interest in J.Y. all withdrew their requests to be considered for placement. The court declared April and Jordan K. were J.Y.'s de facto parents and ordered adoption was the permanent plan for the boy on May 19, 2021, when J.Y. was two years old.

Yet, less than a month later, on June 9, 2021, the trial court granted the request of paternal relatives in Arizona to place J.Y. with them, although he barely knew them and had no bond with them. During reunification, while the Department was searching for a possible relative placement, no one had mentioned the Arizona relatives, father Jerome Y.'s half brother

2

V.Y. and his wife M.Y.  They had not been in contact with the extended family in California for years.  The Arizona relatives had no idea J.Y. had been born, until after the court had terminated reunification services and set a hearing to select a permanent plan.

The principal reason stated by the trial court for its decision to send J.Y. to live with virtual strangers in Arizona was the court's unfounded conclusion that the Department failed in its duty under Welfare and Institutions Code section 361.3 to give preferential consideration to *other* relatives in California (not the Arizona relatives) who requested placement "back when the parents were receiving reunification services."  (All undesignated statutory references are to the Welfare and Institutions Code.)  The court abused its discretion by deciding, without any support in the record, the Department failed in its duty to assess other relatives, and by ordering removal of the child from his de facto parents although there was no evidence that removal was necessary or in the child's best interest.  We therefore reverse the order.

## FACTS

### 1.    The Background and the Parties

J.Y. was detained from his parents in July 2019, when he was two months old, and placed with his foster parents, April and Jordan K.  When J.Y. first arrived in their home, he suffered a flat head.  April K. is a NICU nurse.  She raised the issue at J.Y.'s first appointment with his pediatrician, and obtained a helmet that J.Y. wore for four months to correct his head shape.  April and Jordan K. provided all the care and attention that J.Y. needed as an infant.

3

April and Jordan K. became J.Y.'s de facto parents two years later, at their request, in May 2021. J.Y. has lived with them since he was two months old; theirs is the only home he has ever known. J.Y. has a loving and secure attachment with his de facto parents, and he has thrived in their care. April and Jordan K. have wanted to adopt J.Y. since November 2019. In April 2020, the Department reported the plan was for April and Jordan K. to adopt J.Y. if reunification efforts failed.

The Department provided reunification services to J.Y.'s birth parents for more than a year, but these were unsuccessful. During this period (as we will describe, *post*), the Department communicated with several relatives about their interest in having J.Y. placed with them, but these efforts were unavailing. On November 18, 2020, the court terminated reunification services and scheduled a permanency planning hearing (§ 366.26) for March 2021.

On January 13, 2021, about two months after the court terminated reunification services, the Arizona relatives (father's half brother and his wife) e-mailed the Department to inquire about placing J.Y. with them. "I am not comfortable with allowing him to be placed with a random person/family within the foster/adoption care system." A week or so later, the Arizona relatives told the Department they were interested in adopting J.Y. At about the same time, a maternal great-aunt for the first time indicated her interest in adopting the child. The child's birth father told the social worker he agreed with his half brother becoming J.Y.'s caregiver.

On February 2, 2021, April and Jordan K. began facilitating weekly virtual visits with J.Y. for the Arizona relatives. Visits for maternal great-aunt were also approved in

February. On February 4, 2021, the social worker requested an "RFA" assessment of maternal great-aunt. ("RFA" stands for resource family approval, a process required for any person to qualify to provide care for a child in the foster care system. Maternal great-aunt and her partner were approved as a resource family in May 2021.)

On March 17, 2021, at the request of J.Y.'s counsel, the court set a section 361.3 hearing "on the assessment of relatives for placement." This hearing was eventually held on June 9, 2021.

On March 20, 2021, the Arizona relatives traveled to Los Angeles for their first in-person visit with the child, and there were more visits later, all facilitated by April and Jordan K. On April 1, 2021, the court ordered the Department to initiate an Interstate Compact on the Placement of Children (ICPC) investigation of the Arizona relatives. The ICPC investigation had not been completed at the time of the June 9, 2021 hearing.

On April 7, 2021, the Department filed its report for the section 361.3 hearing, assessing the potential relative placements. The Department's conclusion was that further assessment was needed for the Arizona relatives and maternal great-aunt, but that due to the length of time the child had lived with his de facto parents, the strong bond between them, and the care and stability they provided to J.Y., it was in his best interest to remain placed with and be adopted by April and Jordan K.

## 2. The Legal Background

Section 361.3 provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, before the disposition order. Section 361.3 states that when a child is removed from the

5

physical custody of his or her parents, "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." (§ 361.3, subd. (a).) In determining whether placement with a relative is appropriate, "the county social worker and court shall consider, but shall not be limited to," consideration of all of eight listed factors, the first of which is the best interest of the child. (*Id.,* subd. (a)(1)–(8).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (*Id.*, subd. (c)(1).)

The relative placement preference also applies after disposition, if the child's placement must change. After disposition, "whenever a new placement of the child must be made, consideration for placement shall again be given . . . to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child." (§ 361.3, subd. (d); *In re M.H.* (2018) 21 Cal.App.5th 1296, 1303 [relative placement preference "applies at the disposition hearing and thereafter 'whenever a new placement of the child must be made' "]; see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285 ["[S]ection 361.3 assures interested relatives that, when a child is taken from her parents and placed outside the home pending the determination whether reunification is possible, the relative's application will be considered before a stranger's application."].)

Despite the clear language of the statute, some courts have declared the relative placement preference applies after disposition even when no change in placement is necessary.

Some courts have held the relative placement preference applies throughout the reunification period.  (See, e.g., *In re Joseph T.* (2008) 163 Cal.App.4th 787, 795.)  Other courts have held the relative placement preference applies even after the reunification period if the relative requested placement during reunification but the child services' agency failed to assess the relative for placement.  (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 593, 595 ["[S]ection 361.3 applies after the reunification period where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement."]; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1027, 1032–1033, 1036 [granting mandate petition and ordering juvenile court on remand to evaluate grandmother for placement where a new placement became necessary after reunification services were terminated; social worker prematurely and unfairly abandoned assessment of grandmother for placement].)

   *In re Isabella G.* (2016) 246 Cal.App.4th 708, 712, held "that when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3."  In that case, the grandparents requested placement before the detention, jurisdictional and dispositional hearings.  (*Id.* at p. 722.)  But the agency did not conduct a home assessment of the grandparents and misrepresented that the child's placement could not be changed for a year.  (*Id.* at pp. 722–723.)  Relying on this misrepresentation, the grandparents waited a year and requested placement again

7

before the 12–month review hearing. (*Ibid*.) The agency still did not assess the grandparents' home for placement. The grandparents again requested placement after the court terminated reunification and set a section 366.26 hearing. Not until the grandparents retained counsel and filed a section 388 petition did the agency conduct a home assessment, approving the placement in less than three weeks. (*Isabella G.,* at p. 723.)

None of the cases supports the order in this case. The Arizona relatives first requested placement after reunification services were terminated and the court had set a section 366.26 hearing to select a permanent plan for J.Y., who was in a stable, loving placement with de facto parents who wanted to adopt him. And, as we will now explain, the Department fully complied with its obligation to assess family members for placement during the reunification period.

### 3. The Department's Assessment of Relatives During the Reunification Period

The record shows the following chronology relevant to the Department's extensive efforts to assess placement with relatives during the reunification period.

On July 30, 2019, father provided contact information for paternal grandfather, paternal grandmother and paternal great-cousin. (The statute requires the court to "order the parent to disclose to the county social worker the names, residences, and any other known identifying information of any maternal or paternal relatives of the child." (§ 361.3, subd. (a)(8)(B).))

That same day, the court ordered a pre-release investigation as to possible placement of the child with paternal grandmother. On August 7, 2019, the Department reported to the court its attempts to contact her by telephone, mail, and in

8

person, but she "failed to make herself available and has failed to respond to repeated efforts to assess her home." There were further unsuccessful attempts to meet with her in September, including a message from the social worker on September 25, 2019, requesting a call back to schedule a meeting. That day the social worker also texted father, who stated he would talk to paternal grandmother and let the social worker know when she was available to meet. After the adjudication hearing on October 9, 2019, the court ordered the Department to "assess and place as appropriate with relatives identified by father at detention, PGM or Pat. Great Cousin," and provide an update in the next report.

In December 2019, paternal grandfather contacted the Department to request visitation with the child, and said he wanted to be assessed to become his caregiver. On January 21, 2020, a social worker was assigned to the RFA assessment. Paternal grandfather did his 12-hour training, "but nothing else," and did not interview after several requests.

On January 27, 2020, the Department approved visits with the child for maternal grandmother. The record shows the Department was in touch with maternal grandmother since the inception of the case. She initially stated she was interested in being assessed, but later reported she was not able to become J.Y.'s caregiver.

On March 12, 2020, father told the social worker he wanted paternal grandfather to get custody of his son and said the child's mother agreed with that. But father also informed the social worker that he (father) was living with paternal grandfather. Based on that information, the Department concluded it could no longer consider paternal grandfather's home for possible

9

placement. Paternal grandfather withdrew his RFA application on June 25, 2020.

On March 25, 2020, the social worker telephoned and either spoke to or left messages for four other persons, following up on another social worker's family finding efforts. Maternal great-aunt did not respond, and neither did two others. (A year later, in February 2021, maternal great-aunt explained that when the child was removed from his birth parents, she did not have adequate housing for him.) Paternal great-cousin, who had previously reported an interest, said she did not follow up with her application because she was no longer able to care for the child.

On September 1, 2020, mother told the Department she had family members who were interested in becoming J.Y.'s caregivers, but said she did not then have contact information, and would send it via text message. She never did.

As of September 17, 2020, the Department reported there were no family members interested in providing permanency for the child, and recommended adoption with his foster parents. This repeated the view expressed in the April 2020 status review report, following the conclusion that paternal grandfather could no longer be considered.

4. **The June 9, 2021 Hearing**

At the section 361.3 hearing, the child's counsel requested he be placed with the Arizona relatives. Counsel for father joined in that request. The de facto parents asked the court to deny the request of the Arizona relatives and allow the child to remain with them, as did the Department. Counsel for mother sought placement "with the maternal grandmother," but counsel's

10

comments show he was referring to maternal great-aunt, who "already has an R.F.A. approved home."

The Department submitted several of its reports as exhibits, and the child's counsel submitted a declaration from the Arizona relatives. The court took judicial notice of the de facto parents' request for that status and their accompanying declaration, filed May 12, 2021. (As stated above, April and Jordan K. were declared de facto parents on May 19, 2021, and at the permanency planning hearing that same day, the court ordered adoption as the permanent plan.) April K. testified, principally concerning the close bond the boy has with her and her husband and their facilitation of visits with the Arizona relatives and other members of the child's family. In addition, this exchange occurred between the court and the de facto mother:

"[Y]ou said that the Department advised you that there were family members, such as the [Arizona relatives], who were looking for visitation. [¶] You indicated—you said that she left it up to you; is this correct?

"THE WITNESS: Yes. [¶] We were told that visits were not court ordered. [¶] That if we were willing, especially in light of the COVID pandemic, if we were willing to meet, in person, that that would be good.

"THE COURT: Okay. [¶] But what I'm trying to elicit is she gave you the impression that visitation was up to you. [¶] You could either agree to visits or you could not be agreeable. [¶] You made the decision to be agreeable?

"THE WITNESS: We did. [¶] Yes. [¶] Yes. [¶] We were told there was no court order, but that it would be their recommendation."

11

After argument, the court ordered the child placed with the Arizona relatives. The court's minute order stated: "The Court finds that [the Department] has failed to comply with assessing relatives for placement in a timely manner." The court denied the Department's request to stay the order. The hearing transcript shows the court's reasoning, and we quote it at some length.

"I went back to look at the status review report back in April of 2020, when the parents were receiving reunification services, and at that time, a number of relatives stepped forward to ask to be placed, and the Department's reoccurring response to these placements are that [J.Y.] is in an appropriate placement. [¶] Let me find it, because it's a term they repeat numerous times. [¶] The Department's view is the concurrent plan is adoption with the current—current caregivers. [¶] Although there are other relatives that, at that point stepped up, in terms of looking at the factors, the Department had a responsibility and the Department failed to meet it.

"When the [Arizona relatives] specifically stepped forward in January [2021], the Department did not walk it on. [¶] The Department told [de facto mother] here are some relatives, it's up to her to set up visitation.

"From the court's vantage point, the Department did not do their job, which is unfortunate because my orders are no reflection of the care that this child has had, but I think that it is clear, when you look at the eight factors, [J.Y.] has been with the [de facto parents], but they were foster parents. [¶] I understand that it is hard to devoid yourself, here is an adorable little baby that I'm taking care of. [¶] He calls me Mommy. He calls my

12

husband, Daddy, and he is ours, regardless of what else is going on.

"But the Legislature has a firm commitment that we are here as family court, and although the [de facto parents] are more than willing to bring this child into this family and consider him family, he does have family.

"He has family that has repeatedly stepped up.

"The [Arizona relatives] did not join the discussion until January, but back when the parents were receiving reunification services, the grandmother was asking for placement, the grandfather was asking for placement, the aunt was asking for placement. [¶] The social worker's repeating concern is the concurrent plan is adoption with the current caregivers.

"So in looking at the factors, the court is going to find that the Department did not follow the law, and given the parents— given the family—the relative placement as required by 361.3., either during reunification services or after reunification services."

We pause in our recitation of the court's statements at the hearing to note that, while the court was critical of the Department's handling of visitation by the Arizona relatives— recommending the de facto parents cooperate rather than seeking a court order—that clearly had no causal or adverse effect on the prospects of the Arizona relatives for placement. As the record shows, April and Jordan K. facilitated weekly virtual visits, beginning on February 2, 2021, shortly after the Arizona relatives stated they were interested in adopting J.Y. on January 22, 2021. The record also shows that when maternal great-aunt, who had previously failed to respond when contacted about placement, called the Department to express interest in

13

becoming J.Y.'s caregiver on January 26, 2021, the social worker promptly submitted an RFA request on February 4, 2021.

After indicating it was considering ordering an extended visit for the child in Arizona, the court continued:

"I am open to some other discussion to make the transition, but I want to be very clear, and [de facto parents], it really hurts me to have to do this, because I can see it in your faces, this is your child. He's not bio, but this does not aways mean anything, and you have been providing excellent care for him for almost the first two years of his life.

"The Department failed to meet their burden, so I have to make the tough call. [¶] So I am going to order this child be placed with his paternal relatives, the [Arizona relatives]. [¶] And the Department is going to need to figure out how to do the extended visit.

"I am mindful of the fact that he has a bond with his current caretakers, but I do not know that weaning him into his aunt and uncle's home is going to be a better plan that just doing it, and let it be done. [¶] The court believes that he can develop an appropriate attachment with other family members as he does with the [de facto parents]."

Counsel for the Department then tried to tell the court about "the Department's efforts in regard to the other relatives," but the court interrupted and stated, "You made your argument."

The court would not grant a stay, stating: "I'm unwilling, because in my mind, the Department needed to do more than they did, that is why I'm sitting here looking at this heartbroken woman, [de facto mother], as I move this child. [¶] If the Department had done what they should have done, I would not have to make the call. [¶] So, no."

14

## 5.  Subsequent Proceedings

The de facto parents filed a notice of appeal on June 14, 2021.  They also filed a supersedeas petition and request for an immediate stay.  We temporarily stayed the juvenile court's order placing the child with the Arizona relatives and permitted responses by the interested parties—the child, mother, father, the Arizona relatives, and the Department—and a reply from the de facto parents.  On August 4, 2021, the Department also filed a notice of appeal.

On September 3, 2021, we ordered the stay to remain in effect until 60 days after the remittitur issues in the appeal.  We also granted a request to expedite the appeal.  On October 1, 2021, we denied a motion by the Arizona relatives to vacate our order.

During briefing of this appeal, the Department filed a motion to strike portions of the Arizona relatives' respondents' brief:  specifically, arguments referring to the postappeal approval under the ICPC of the Arizona relatives and their home as an appropriate placement for the child.  The approval occurred as of September 20, 2021, well after the trial court's June 9, 2021 decision, and the filing of these appeals on June 14 and August 4, 2021.

We decline to strike the specified portions of the brief as unnecessary.  The trial court glaringly erred in placing the child in Arizona without an ICPC approval, but as the Department acknowledged in its opening brief, that issue is moot because of the subsequent ICPC approval.  More to the point, the ICPC approval, and the arguments referring to it, are irrelevant to the basis for our reversal of the trial court's order.  For the same reason, we need not discuss the affidavits filed by the Arizona

15

relatives and the de facto parents, describing the circumstances and their desire and ability to provide a permanent home for J.Y.

## DISCUSSION

The trial court abused its discretion by setting a section 361.3 hearing after the reunification period ended, where the Department had fulfilled its obligations to assess relatives for placement during reunification, and there was no need to change J.Y.'s placement. With no legal authority to do so, the court ordered J.Y. be uprooted from his stable and loving placement—after the court had declared adoption was the plan, and the de facto parents wanted to adopt him—to place him with virtual strangers.

We have described at length both what the Department did in connection with requests by relatives for placement during the reunification period, and the rationale expressed by the court in making its ruling: that "the Department did not do their job," and "[i]f the Department had done what they should have done, I would not have to make the call." The record facts do not support the court's reasoning.

The court said that when the parents were receiving reunification services, "a number of relatives stepped forward" requesting placement, and the Department's "reoccurring response" was that J.Y. was in an appropriate placement. That is a misreading of the record. The court based its statement on the Department's April 2020 report, where the Department stated the plan was adoption with the current caregivers. But by April 2020, paternal grandfather had been eliminated from consideration because father told the Department he was living with paternal grandfather (who in any event removed himself from consideration two months later). Maternal grandmother

16

initially expressed interest in being assessed, but later reported she was not able to become J.Y.'s caregiver. Maternal great-aunt did not return the social worker's calls, and now admits that at the time she had no space for the child. Other prospects likewise did not return the social worker's calls.

In short, the trial court's statement "the grandmother was asking for placement, the grandfather was asking for placement, the aunt was asking for placement" is true, but irrelevant, because they were all eliminated from consideration through their own actions, not the Department's. There is no basis for the court's finding that "the Department did not follow the law."

J.Y.'s counsel, father, and the Arizona relatives all insist the placement order was proper and should be affirmed. None of their contentions is persuasive.

J.Y.'s counsel argues the de facto parents have no standing to challenge the juvenile court's order. We need not be drawn into a discussion on the question, since the Department has appealed the order and we necessarily decide the matter in any event.

J.Y.'s counsel argues "it is clear from the court's comments that it did, indeed, consider all 8 factors listed in section 361.3 and it did so throughout the hearing." We cannot agree. At the beginning of the hearing, addressing the proposed testimony of the de facto mother, the court stated the issue "is whether 361.3 has been observed," and "[t]here are eight considerations the court is—has to take, and it is the best interest of the child," and "she can testify as to one of the eight considerations with respect to her relationship with [J.Y.]." After the testimony and argument, the court stated during its ruling: "when you look at the eight factors, [J.Y.] has been with the [de facto parents]."

And the court concluded: "So in looking at the factors, the court is going to find that the Department did not follow the law, . . . either during reunification services or after reunification services."

These statements by the court are nothing more than perfunctory references to the factors, followed by the explicit finding that the Department "did not follow the law." There was no need to change J.Y.'s placement and no reason to find it would be in his best interest to remove J.Y. from the only parents he had ever known. Indeed, the court's placement of the child in Arizona without a completed ICPC investigation, although now a moot point, further indicates the court's disregard for the statutory limitations upon its authority in the exercise of discretion. "The overriding concern of dependency proceedings . . . is not the interest of extended family members but the interest of the child," whose bond with a foster parent may require that placement with a relative be rejected. (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) "The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests." (*Ibid.*)

## DISPOSITION

The order is reversed.


GRIMES, Acting P. J.

WE CONCUR:


STRATTON, J.          WILEY, J.


18